UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANGELA NORTHNESS, | |
| Petitioner, | Case No. 1:15-cv-00519-CWD |
| v. | **MEMORANDUM DECISION AND ORDER** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security Administration, | |
| Respondent. | |

## INTRODUCTION

Currently pending before the Court is Angela Northness's Petition for Review of the Respondent's denial of social security benefits, filed on November 3, 2015. (Dkt. 1.) The Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and the administrative record (AR), and for the reasons that follow, will affirm the decision of the Commissioner.

## PROCEDURAL HISTORY

Petitioner filed an application for Disability Insurance Benefits and Supplemental Security Income on September 25, 2012. This application was denied initially and on

reconsideration, and a hearing was held on February 11, 2014, before Administrative Law Judge (ALJ) John Molleur. After hearing testimony from Petitioner, Petitioner's father, and a vocational expert, ALJ Molleur issued a decision on March 13, 2014, finding Petitioner not disabled. Petitioner timely requested review by the Appeals Council, which denied her request for review on September 25, 2015.

Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Petitioner was twenty-eight years of age. Petitioner has a college education, having graduated from Boise State University with a bachelor's degree in English Literature in 2009.[1] Her prior work experience includes part-time work as a developmental therapy technician.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. Although Petitioner had prior work experience, the ALJ found Petitioner's previous work experience did not rise to the level of substantial gainful activity. Therefore, the ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date of August 17, 2011.

---

[1] Petitioner enrolled in 2003, and graduated with a 3.0 grade point average. (AR 49.)

At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's bipolar disorder, linea morphea, scleroderma, Sjogren's syndrome, and nephrolithiasis severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found Petitioner's impairments did not meet or equal the criteria for the listed impairments, specifically considering Listings 12.04, affective disorders; 12.04, systemic sclerosis (scleroderma); 14.09, inflammatory arthritis; and 14.10, Sjogren's syndrome. The ALJ determined none of Petitioner's impairments met or equaled the criteria for the listed impairments considered.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work. In assessing Petitioner's functional capacity, the ALJ determines whether Petitioner's complaints about the intensity, persistence and limiting effects of her pain are credible.

Here, the ALJ found Petitioner's complaints not entirely credible. The ALJ found also that the medical source statements of Petitioner's treating physicians, Drs. Knibbe and Belnap, were not consistent with the medical records as a whole from Petitioner's onset date forward. Accordingly, the ALJ gave their opinions limited weight.

After so doing, the ALJ determined Petitioner retained the RFC to perform less than the full range of light work, with limitations upon sitting, standing and walking. The ALJ found Petitioner was able to lift or carry 20 pounds occasionally and 10 pounds

frequently, and should avoid climbing ladders and performing postural activities occasionally. The ALJ limited Petitioner to frequent forceful gripping or twisting, and handling and fingering, with her hands. The ALJ further limited Petitioner to avoiding concentrated exposure to dusts, fumes, gases, poor ventilation, noxious odors, and temperature extremes. Finally, the ALJ limited Petitioner to work requiring uninvolved 3-4 step tasks, occasional contact with the general public, and frequent interaction with co-workers and supervisors. (AR 18.)

The ALJ found Petitioner had no past relevant work, and therefore proceeded to step five. The burden shifts to the Commissioner to demonstrate, at step five, that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education and work experience. Here, the ALJ found Petitioner retained the ability to perform the requirements of representative occupations such as office helper, warehouse support worker, and document preparer. Consequently, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971).

An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision

must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner contends the ALJ erred at steps three and four. Specifically, Petitioner argues the ALJ's determination that Petitioner's mental impairments did not meet Listing 12.04 was in error; that he improperly rejected the opinions of Dr. Grant Belnap and Dr. Patrick Knibbe, as well as the testimony of Petitioner's father; and that the ALJ's credibility assessment was in error. Consequently, Petitioner asserts the RFC determination did not adequately take into account the cumulative effects of Petitioner's mental and physical limitations, and was erroneous. The Court will address each of Petitioner's arguments below.

1.      **Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).

When assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. If the claimant has presented such evidence, and there is no evidence of malingering, the ALJ must give "specific, clear and convincing reasons" to reject the claimant's testimony about the severity of the symptoms. *Id*. At the same time, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

When evaluating the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, *id.*; "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment," *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007). While a claimant need not "vegetate in a dark room" to be eligible for benefits, *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987), the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent they contradict claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225.

The reasons an ALJ gives for rejecting a claimant's testimony must be supported by substantial evidence in the record. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999). If there is substantial evidence in the record to support the ALJ's credibility finding, the Court will not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 957, 959 (9th Cir. 2002). When the evidence can support either

outcome, the court may not substitute its judgment for that of the ALJ. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

The ALJ found Petitioner's impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements about the intensity, persistence, and limiting effects of her symptoms were not entirely credible. The ALJ found Petitioner's treatment history, symptom improvement with medication, and activities of daily living were inconsistent with the degree of symptoms alleged.

With regard to Petitioner's treatment history, the ALJ gave a detailed explanation supporting his reasoning that it was inconsistent with the degree of disability Petitioner alleged. (AR 20 – 21.) Her physical symptoms of joint pain, stiffness, and right-sided atrophy caused by Petitioner's scleroderma and linea morphea appear to be controlled with medication, shoe inserts, and other conservative treatment. (AR 20-21.) The ALJ's discussion of Petitioner's treatment records from Dr. Knibbe, her rheumatologist, mirrors the summary Petitioner provided in her brief, and generally reflect improvement with Meloxicam. (*See* Dkt. 10 at 5 – 12; AR 378 (treatment note dated 2/24/12: "Meloxicam has solved the problem.")). Similarly, in July of 2013, a rheumatology checkup noted no synovitis, no enthesitis, and no loss of motion, with strength intact, and that Petitioner's linear morphea was presently inactive. (AR 445 – 446.) Petitioner was advised to resume activity. (AR 446.)

A November 2013 nephrology follow-up appointment noted Petitioner appeared to be doing reasonably well. (AR 635.) And finally, a January 2014 rheumatology

appointment reflected that, while Petitioner complained of an increase in joint pain, she had stopped the Meloxicam due to its ineffectiveness, and was doing well with ibuprofen for pain. (AR 677 – 678.) Dr. Bradley noted no synovitis and no enthesis, and only tenderness at her hands, shoulders, and knees. (AR 679.) Petitioner was advised to engage in regular exercise. (AR 677.) No rheumatology follow-up was necessary for another six months. (AR 677.)

The ALJ carefully examined all of the above records, finding improvement from medication with regard to Petitioner's complaints of joint pain and swelling, and relatively limited treatment interventions. The Court finds substantial evidence supports the ALJ's conclusion in this regard.

Turning to Petitioner's mental health treatment for her bipolar disorder, the record reveals consistent counseling appointments in 2012 and 2013, as well as the use of medication to control her symptoms. (AR 20 – 22.) In February of 2012, Petitioner reported to her counselor some stress and anxiety related to her upcoming wedding, but that Klonopin was "very helpful." (AR 20, 378.) In late 2011 and early 2012, Petitioner attended couples counseling with her spouse, with counseling focusing on relationship issues. (AR 414 - 423.) At a July 2012 individual appointment, the counselor noted the discussion centered around stressors in the marriage, but the mental status examination findings were generally normal, and in the counselor's opinion, Petitioner's GAF score was 70. (AR 414.) The ALJ next noted Petitioner's medical records for the remaining months of 2012 and into early 2013 did not reflect additional visits for any worsening

mental health issues. Instead, the records indicate Petitioner became pregnant, discontinued her medication, and was reportedly doing well throughout her pregnancy until delivery of a healthy baby boy via Cesarean section on March 24, 2013. (AR 537, 598.) Petitioner was discharged on March 28, 2013. (AR 537.)

Although she developed an infected pelvic hematoma post delivery, treatment notes from her obstetrician, Dr. Jenni Bradley, dated May 8, 2013, indicate Petitioner had resumed taking Abilify and Cymbalta, and Petitioner reported tolerating them well with an improvement in her symptoms of depression. (AR 590.) On May 29, 2013, Petitioner reported a change in her medication from Cymbalta to Prozac, and that she was doing well. (AR 587.) Notes from her post-partum follow-up appointment on June 21, 2013, indicate Petitioner reported doing "okay at home," although she reported a lack of energy related to her recent delivery and post-partum complications. (AR 596.) Petitioner at that time denied manic symptoms, and that when she felt down, her symptoms lasted for hours, not days, and that she was having no trouble sleeping. (AR 596.) None of the medical records related to Petitioner's pregnancy and post-partum care reflect significant psychological complaints. The ALJ discussed the relatively benign complaints regarding her mental health Petitioner presented to her health care provider throughout the course of her pregnancy, finding the lack of any significant mental health difficulties inconsistent with Petitioner's testimony. (AR 20-21.)

Petitioner resumed individual counseling in September of 2013. (AR 452 - 462.) Treatment notes, which the ALJ discussed, generally reflect situational stressors,

including Petitioner's husband's incarceration, living at home with her parents, issues with overspending, and general coping skills. The ALJ noted that the counselor's notes and mental status examinations did not reflect significant abnormality. By October 29, 2013, Petitioner reported significant improvement in her mood due to taking Abilify. (AR 459.) The ALJ specifically discussed all of the above mental health records (AR 20-21), which constitute substantial evidence in support of the ALJ's conclusion that Petitioner's testimony about the disabling effects of her bipolar disorder were not as severe as claimed.

Next, the ALJ cited Petitioner's relatively positive response to medication, both for her rheumatologic symptoms and her bipolar symptoms. (AR 21 – 22.) The ALJ noted there were numerous medical records where Petitioner reported improvement with psychotropic medications, specifically Abilify, Cymbalta, and Zanax, and that she had no rheumatologic complaints throughout her pregnancy, despite ceasing Meloxicam during that time. (AR 21, 613.)

Petitioner argues the ALJ dismissed Petitioner's claim she is more susceptible to infection due to the treatment of her scleroderma with Meloxicam, such that she suffers from colds, sinus infections, and other viruses on a frequent basis. (Dkt. 10 at 24.) However, the ALJ noted the record does not reflect any significant concerns or recurrent infections, and that the few times Petitioner presented with infections, they were responsive to treatment and presented as isolated incidents. (AR 21.) The ALJ therefore

concluded the record did not corroborate Petitioner's allegations of an extremely depressed immune system secondary to Meloxicam use. (AR 21.)

The Court has independently reviewed the record, and finds Petitioner suffered relatively benign bouts with common ailments, which resolved with appropriate conservative care. Her urinary tract infection and cough (April 23, 2011) was treated with antibiotics (AR 423 – 444); her toe ulcer (May 7, 2012) healed with antifungal medication (AR 381 – 386); her infected pelvic hematoma, for which she was hospitalized on April 2, 2013, after the birth of her baby, resolved after a brief hospitalization and uneventful outpatient follow up care (AR 556 – 566; 494 – 597); another toe infection (October 1, 2013) was treated with antibiotic cream (AR 551 – 553); and a urinary tract infection (October 27-28, 2013) similarly improved after treatment (AR 539 - 550). Petitioner did not suffer any further infections until March 14, 2014, when she sought treatment for ongoing rhinitis, diagnosed as a sinus infection, for which she was prescribed Augmentin, Mucinex D and nasal steroid spray. (AR 699 – 707.) Based upon the above, the Court finds substantial evidence in the record supports the ALJ's conclusion.

Finally, the ALJ discussed Petitioner's activities of daily living, which he found inconsistent with the degree of disability Petitioner alleged. "[I]f a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting," an adverse credibility finding is appropriate. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Petitioner reported being

able to sit and use the computer for significant periods of time to play various video games and read Facebook posts; she cared for her dog and Guinea pig; she prepared simple meals for herself on a daily basis; she was able to do her own laundry, vacuum, and clean the house by herself; she drove a car and shopped for groceries, clothes, and books; she paid bills; handled a savings account; read; watched television; sewed;[2] took herself to her doctor's appointments; could walk one-half mile at a time without rest; and followed written instructions easily. (AR 319 – 327; 378.) Petitioner reported also that she could care for her baby through the night, and take him by herself to the prison once a week to visit her husband. (AR 22, 51 – 56, 677.)

     The ALJ next discussed, in detail, how the above activities of daily living translate to a work setting. (AR 22.) Specifically, the ALJ found that Petitioner could walk, lift and carry her 17-pound child as well as items like groceries and cleaning products; interact with strangers, such as store clerks and prison personnel; maintain close relationships with family; and execute multi-step tasks, such as using the computer or performing craft work. The ALJ noted further that, despite Petitioner's alleged frequent infections, she is not fearful of public places where she could become exposed to bacteria or viruses. (AR

---

[2] Petitioner reported on February 24, 2012, to Dr. Knibbe she was staying busy doing crafting with sewing and other hand crafts, and was looking forward to starting a Pink workout. (AR 378.) Celebrity pop-star Pink apparently publishes a workout and diet routine, consisting of five to six, 90-minute sessions a week. www.popworkouts.com/pink-workout (last accessed Feb. 7, 2017.)

22.) The ALJ's conclusion that Petitioner's activities of daily living constitute transferable skills to the work place is supported by substantial evidence in the record.

Because the ALJ's reasons for finding Petitioner not entirely credible regarding the limiting effects of her impairments are supported by substantial evidence, the Court finds there was no error.

## 2. Lay Witness Testimony

Petitioner argues the testimony of her father, Gerald LaCava, was rejected erroneously on the grounds that his statements relied upon his daughter's subjective statements, which were also erroneously rejected. Consequently, Petitioner argues if Petitioner's statements were credited, Mr. LaCava's statements should have been given more weight.

An ALJ must consider evidence from sources other than the claimant, including family members and friends, to show the severity of a claimant's impairment. 20 C.F.R. § 404.1513(d)(4); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). Lay testimony regarding a claimant's symptoms constitutes competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (internal citations omitted)); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294 (9th Cir. 1999). Such reasons include conflicting medical evidence, prior inconsistent

statements, or a claimant's daily activities. *Lewis v. Apfel*, 236 F.3d 503, 511–12 (9th Cir. 2001).

In rejecting lay testimony, "the ALJ need not cite the specific record as long as 'arguably germane reasons' for dismissing the testimony are noted, even though the ALJ does 'not clearly link his determination to those reasons,' and substantial evidence supports the ALJ's decision." *Holzberg v. Astrue*, No. C09-5029BHS, 2010 WL 128391 at *11 (W.D. Wash. Jan. 11, 2010) (citing *Lewis*, 236 F.3d at 512). However, "where the ALJ's error lies in failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F3d 1050, 1056 (9th Cir. 2006).

Mr. LaCava testified at the hearing and provided also a third party function report. (AR 310, 351.) Mr. LaCava is a retired university professor who confirmed Petitioner has lived and currently does live with him and his wife. He reported Petitioner suffers from poor judgment, citing to concerns with her money management and her provision of less than ideal childcare. (AR 69, 70, 72, 22.) He testified that he and his wife have supported, and continue to support, Petitioner financially. (AR 72-73, 78-81.) Mr. LaCava indicated Petitioner can take care of all her activities of daily living; perform household chores such as dusting, vacuuming, and laundry; run errands, including shopping for groceries, personal items, books, and DVD's; spend time on the computer; and visit the prison

where her husband and her child's father currently resides, among other tasks. (AR 310 – 318.)

The ALJ gave Mr. LaCava's testimony some weight, and supported his credibility determination with specific and germane reasons. The ALJ noted Mr. LaCava, in addition to confirming Petitioner could perform a wide range of daily activities, admitted he and his wife have stepped in to help Petitioner before help was a necessity, suggesting Petitioner may be more competent than her father suspects. The Court identified, and the ALJ noted also, that Petitioner's baby boy had been found only twice with soiled diapers before Petitioner's parents began providing the majority of his care. (AR 77.) Petitioner herself testified her parents "were always there to help me." (AR 59.) The ALJ elicited during Petitioner's testimony that Petitioner knew if something did not work out, her parents would always be there for her, giving another example of her parents paying off her overdue credit card bills in excess of her credit limit. (AR 58-60.) In addition, the ALJ cited Petitioner's limited treatment history and good mental health status examinations as reasons to limit the influence of Mr. LaCava's testimony about his daughter's abilities. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with medical evidence is a reason to discredit the testimony of lay witnesses).

The Court finds substantial evidence in the record supports the ALJ's conclusions with respect to Petitioner's credibility, which conclusions were free from legal error.

### 3.     Physician Opinions

Petitioner contends the ALJ erroneously rejected the opinion of Petitioner's treating providers, Dr. Grant Belnap, and Dr. Patrick Knibbe, because the ALJ did not properly weigh their opinions against those of the state agency physicians, and erroneously concluded the opinions were not supported by or consistent with other medical evidence.

The Ninth Circuit Court of Appeals distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chatter*, 81 F.3d 821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). Also, "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

An ALJ is not required to accept an opinion of a treating physician if it is conclusory and not supported by clinical findings. *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a physician's opinion of a claimant's physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support the physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities. *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999). An ALJ also may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self -reports that have been property discounted as not credible. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Dr. Grant Belnap examined Petitioner on December 17, 2013. (Dkt. 450-451.) Although he assigned Petitioner a GAF score of 49 at that time and was of the opinion Petitioner was "at baseline [and] still disabled…unlikely to ever hold meaningful employment," his treatment notes indicate that, after missing several doses of medication and obtaining a prescription for Cymbalta, Petitioner was "doing okay now." She was noted as having power struggles with her parents over spending, but that she had no suicidal ideation and her mood was "ok otherwise." Her thought processes were intact,

her speech was fluid and appropriate, and her attention was good. A follow up note dated January 28, 2014, indicated Petitioner's mood was down, as she was struggling with a sinus infection. (AR 613 – 616.) Again, Dr. Belnap assigned a GAF score of 49, and remained of the opinion Petitioner could not hold meaningful employment, but treatment notes from January 21, 2014, and January 28, 2014, indicate a fairly normal mental status examination, normal thought processes, and generally benign findings regarding Petitioner's speech and attitude. Dr. Belnap further noted that her depressed mood may be "seasonal." (AR 614.) Notes indicate also that Petitioner reported her sleep was "good," and that although she was tired during the day, it may just be boredom. (AR 615.)

Dr. Belnap completed a mental RFC assessment on August 19, 2013, finding Petitioner had marked limitations in the ability to understand, remember, and carry out instructions; to maintain attention and concentration; to maintain regular attendance; and to maintain an ordinary routine, as well as marked limitations in several other areas. (AR 581 – 583.) Dr. Belnap elaborated, explaining Petitioner's sustained focus, concentration, and task completion is difficult due to depression, and therefore Petitioner would not be able to either sustain focus throughout a full work day or work independently. (AR 583.)

The ALJ discussed Dr. Belnap's opinion, finding it inconsistent with other evidence in record. Specifically, the ALJ noted Petitioner was able to finish her bachelor's degree at BSU and work part-time while doing so, with no apparent worsening of her condition. The ALJ further noted that counseling records during the same time

period indicated Petitioner was able to maintain a schedule, and were therefore inconsistent with Dr. Belnap's conclusions. And finally, the ALJ noted Dr. Belnap's own treatment notes, indicating generally normal mental status examinations, were inconsistent with his opinions. Accordingly, the ALJ gave Dr. Belnap's opinions little weight. (AR 21, 23.)

The ALJ further commented that the psychological consultative examiner, Dr. Jerry Doke, who examined Petitioner on October 8, 2012, conducted a thorough review of the record and a mental status examination. (AR 432 – 437.) Petitioner reported to Dr. Doke that she left her last job in August of 2011, when she had to take extra sick days after the death of her grandfather. (AR 434.) Petitioner reported having no problems with her activities of daily living, that she had several good friends, her mental status exam was within normal limits, and her judgment was intact. Dr. Doke's diagnosis was major depressive disorder, with a GAF score of 65, and that Petitioner was "mildly impaired" with regard to her ability to perform work-related mental activities and interacting with others. The ALJ gave Dr. Doke's opinion great weight, on the grounds that the opinion was consistent with the medical records as a whole, and reflective of Petitioner's activities of daily living. (AR 23.).

And finally, the ALJ discussed the opinions of Dr. Knibbe, Petitioner's rheumatologist. (AR 23, 631 – 634; 680.) Dr. Knibbe recorded on February 5, 2014, that Petitioner would be able to stand and walk for 4 hours, as well as sit for 4 hours, in an 8-hour work day, with the ability to change positions every thirty minutes. Dr. Knibbe

opined also Petitioner could lift 10 pounds occasionally, and 5 pounds frequently, and would be limited in her ability to engage in postural activities. Dr. Knibbe's supplemental opinion indicated Petitioner could only work 2-4 hours each day, and miss 4 days each month due to her physical impairments.

The ALJ found the supplemental opinion inconsistent, given Dr. Knibbe's earlier opinion indicated Petitioner could sit for 4 hours and stand for 4 hours in an 8-hour work day. (AR 23.) Further, the ALJ noted Dr. Knibbe's opinions were inconsistent with Petitioner's activities of daily living, which included using the computer, taking care of her baby, driving, shopping, and other daily tasks, as well as visiting her husband at the prison each week. And finally, the ALJ noted Dr. Knibbe's treatment notes reflected Petitioner's physical impairments as stable. (AR 23.) Accordingly, the ALJ gave Dr. Knibbe's opinions limited weight.

Petitioner argues that, with the exception of Dr. Doke, the medical opinions of Petitioner's treating physicians are consistent with each other, and should have been given controlling weight because of their longstanding treatment history with Petitioner. However, the Court finds the ALJ gave specific and legitimate reasons supported by substantial evidence in the record for giving the conclusions of Dr. Knibbe and Dr. Belnap limited or little weight. As discussed above, there is substantial evidence in the record that the treatment notes, when taken as a whole, reflect an individual who did not exhibit marked mental impairments given Petitioner's reported activities and consistent statements by Petitioner and other physicians that she was doing better on medication.

**MEMORANDUM DECISION AND ORDER - 22**

Further, with regard to Petitioner's physical impairments, Dr. Knibbe's own records indicated Petitioner's scleroderma was stable, and Petitioner had even ceased medication other than ibuprofin for her pain for a period of time. Accordingly, the Court finds the ALJ's conclusions free from legal error with regard to the weight given the treating physicians' opinions.

**4.    Meet or Equal a Listing**

The ALJ found that Petitioner's impairments did not meet or equal any listing. Petitioner contends the ALJ's findings were in error with regard to his consideration of Listing 12.04, covering affective disorders.

If the claimant satisfies the criteria under a listing and meets the twelve-month duration requirement, the Commissioner must find the claimant disabled without considering age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(iii), (d). A claimant bears the burden of producing medical evidence that establishes all of the requisite medical findings that his impairments meet or equal any particular listing. *Bowen v. Yuckert,* 482 U.S 137, 146, n. 5 (1987). Further, if the claimant is alleging equivalency to a listing, the claimant must proffer a theory, plausible or other, as to how his combined impairments equal a listing. *See Lewis v. Apfel,* 236 F.3d 503, 514 (9th Cir. 2001).

An impairment, or combination of impairments, is medically equivalent to a listing "if it is at least equal in severity and duration to the criteria of any listed impairment," considering "all evidence in [the] case record about [the] impairment(s) and

its effects on [the claimant] that is relevant…." 20 C.F.R. § 404.1526(a), (c). Further, equivalence depends on medical evidence only; age, education, and work experience are irrelevant. *Id.* at § 404.1526(c). Finally, and critically, "the claimant's illnesses 'must be considered in combination and must not be fragmentized in evaluating their effects.'" *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995) (quoting *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir. 1985)).

"A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listed impairment. *Lewis*, 236 F.3d at 512 (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)).

Listing 12.04, covering affective disorders, requires the presence of both the A and B, or A and C criteria, to satisfy the listing.[3] In evaluating step three, the ALJ determined Petitioner's mental impairment did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (AR 17.) The ALJ expressly cited Petitioner's ability to care for herself and her baby, attend to her personal needs, and maintain relationships. Alternatively, the ALJ considered the paragraph C criteria, finding Petitioner did not experience any episodes of decompensation after her alleged onset date; she did not live in a highly supportive living environment; and she could adjust to changes in her environment, noting she became a

---

[3] Listing 12.04 was revised, and the new criteria became effective January 17, 2017. www.ssa.gov. This matter was decided prior to the revisions, however.

mother and was able to cope with her husband's incarceration. *See* 20 C.F.R. pt. 404 subpt. P, app. 1, §§ 12.00A, 12.04 (2014).

Petitioner argues the determination was error because the ALJ failed to consider the paragraph A criteria before addressing paragraph B. However, the Listing requires both A and B, or A and C. In the absence of either the B or C criteria, Petitioner cannot satisfy the requirements of Listing 12.04, regardless of any findings under paragraph A. The ALJ did not err.

Second, Petitioner asserts that, had the ALJ properly credited Dr. Belnap's and Dr. Knibbe's opinions, the ALJ would have found Petitioner met Listing 12.04. As the Court has previously explained, the ALJ did not err in his analysis of either Dr. Belnap's or Dr. Knibbe's opinions.

Therefore, the ALJ's evaluation of Listing 12.04 was supported by substantial evidence.

**5.      Residual Functional Capacity**

Last, Petitioner argues the ALJ's RFC finding is not supported by substantial evidence in the record. A claimant's RFC represents a finding of the range of tasks she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis. *Id*. To properly ascertain a claimant's RFC, an ALJ must therefore assess Petitioner's exertional

capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). These include mental limitations such as the effects of depression, fatigue, pain, tenderness, numbness and muscle spasms.

Because of the Court's findings, above, Petitioner's argument that the ALJ erred because he did not consider the impact of all of Petitioner's mental and physical impairments when formulating Petitioner's RFC is without support in the record. Essentially, Petitioner argues that, had the ALJ found Petitioner fully credible, the RFC would have addressed all of Petitioner's alleged impairments and resulted in a finding of disability. Similarly, Petitioner argues, had the ALJ credited Dr. Belnap's and Dr. Knibbe's opinions, the RFC assessment would have resulted in a finding of disability. However, the Court finds the ALJ did not err in his credibility assessment or in his analysis of the treating physicians' opinions, and therefore, the RFC finding also is free from legal error.

# ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises, **it is hereby ORDERED that** the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act is **AFFIRMED** and that the petition for review is **DISMISSED**.

DATED: February 7, 2017

Honorable Candy W. Dale
United States Magistrate Judge